## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>GIOVANNI LARA,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)     No. 95-CR-75-08-JJM-PAS |

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

A jury convicted Giovanni Lara, an eighteen-year-old youth at the time, of carjacking in violation of 18 U.S.C. § 2119(3), and witness intimidation in violation of 18 U.S.C. § 1512(b)(3).[1]  *Lara v. United States*, C.A. No. 00–554–ML, 2008 WL 608323, at *1 (D.R.I. Mar. 4, 2008) [hereinafter Postconviction Order V]. Although "[t]here were conflicting accounts of Lara's participation in the carjacking," the criminal conduct resulted in the death of Temujin Vandergroen. *United States v. Lara*, 181 F.3d 183, 201 (1st Cir. 1999), *cert. denied*, 528 U.S. 979 (1999). Following the United States Sentencing Guidelines, which were mandatory at the time, the Court sentenced Mr. Lara to life imprisonment. Postconviction Order V at *1.

Mr. Lara now seeks a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), asserting that his youthfulness at the time he committed the crime, the fact that he

---

[1] The jury found Mr. Lara not guilty on four other counts: Count 1 (Racketeer Influenced and Corrupt Organizations Act ("RICO")–including for the murder of Temujin Vandergroen), Count 2 (Conspiracy to Commit Racketeering), Count 3 (Violent Crimes in Aid of Racketeering), and Count 10 (Drug Distribution). ECF No. 731.

was not the trigger person, the severity of a life-without-parole sentence, and his extraordinary rehabilitation combine to meet the statutory criteria. *See* ECF No. 1320 at 1-4. He then argues that this Court should find that his twenty-eight years of imprisonment is sufficient to accomplish the 18 U.S.C. § 3553(a) sentencing factors. *Id.* The Court agrees with Mr. Lara and GRANTS his Motion for a Sentence Reduction pursuant to 18 U.S.C. § 3582(c)(1)(A). *Id.*

## I.   FACTUAL BACKGROUND

Mr. Lara is one of several defendants who were convicted in 1997 of multiple crimes arising out of their involvement in the Latin Kings[2] local chapter. *See Lara*, 181 F.3d at 190. Mr. Lara's part in the criminal conduct involved a carjacking offense that resulted in the death of Temujin Vandergroen. Postconviction Order V at *1. In one of the postconviction opinions by the trial judge, she succinctly explained the facts underlying this case:

> The evidence at trial pertinent to the carjacking offense showed that the victim, Temujin Vandergroen, inadvertently precipitated the incident by playing with a knife in front of the children of co-defendant George Perry. Perry interpreted this as a sign of disrespect, intolerable to a Latin King. He asked Lara to accompany him while he robbed Vandergroen of his Ford Escort, which vehicle had tire rims that Perry coveted. On September 6, 1994 the two men asked Vandergroen to take a ride with them. When he agreed, Perry (who had brought along a sawed-off shotgun) sat behind Vandergroen in the car, while Lara sat in the front passenger seat. At Perry's request, Vandergroen drove to a deserted neighborhood. Perry then told Vandergroen to slow or stop the

---

[2] "The Latin Kings originated in Chicago in the 1940s. Over time, the street gang's influence spread to other venues. The movement migrated east to Providence in the early 1990s. Though some chapters of the Latin Kings, called Charter Nations, require Hispanic descent as a condition of membership, others (like the Providence chapter) allow persons of all races and ethnicities to join." *United States v. Lara*, 181 F.3d 183, 190 (1999).

vehicle, and when Vandergroen complied, Perry shot him at close range in the back of the head. Perry and Lara shoved Vandergroen's body into the street and returned to a Latin King hangout, where they were seen with blood and brain matter on their clothing. The two later burned and abandoned Vandergroen's car.

*Id.* After the trial, the Court sentenced Mr. Lara to life in prison followed by three years of supervised release.[3] Postconviction Order V at *1. The United States Court of Appeals for the First Circuit affirmed Mr. Lara's conviction on direct appeal. *Lara,* 181 F.3d at 206.

## II.   PROCEDURAL POSTURE

After losing his direct appeal, Mr. Lara challenged his conviction in a series of postconviction relief actions over the next two decades, filing motions both here and in the United States District Court for the Middle District of Pennsylvania, where he was then incarcerated.[4] No court granted any of Mr. Lara's requested relief.

---

[3] The Court imposed the sentence for the carjacking offense under § 2B3.1 (robbery) of the United States Sentencing Guidelines. Postconviction Order V at *1. This guideline provided that, "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111," a sentencing court had to apply the first-degree murder guideline. U.S.S.G. § 2B3.1(c)(1). The Court found that U.S.S.G. § 2 A. 1.1 (first degree murder) applied and imposed life imprisonment. Postconviction Order V at *1.

[4] Mr. Lara moved to vacate his sentence under 28 U.S.C. § 2255, but the Court denied relief. *Lara v. United States,* No. 00–554–ML (D.R.I. Dec. 4, 2001) (slip op.). The First Circuit affirmed. *See Lara v. United States,* No. 01–2745, Judgment (1st Cir. May 28, 2002). Mr. Lara then moved to reduce his sentence under 18 U.S.C. § 3582(c)(2), but the Court also denied that motion, and the denial was affirmed on appeal. *See United States v. Lara,* No. 03–2689, Judgment (1st Cir. June 21, 2004). Mr. Lara later filed a motion under Fed. R. Civ. P. 60(b) for relief from the judgment that denied his § 2255 motion, and the Court denied that motion. *See Lara v. United States,* No. 00–cv–554–ML. Then Mr. Lara filed a *Coram Nobis* Petition, which the Court also denied. *Lara v. United States,* No. 05–287–ML, 2006 WL 161599, at *1 (D.R.I. Jan. 20, 2006).

Now, twenty-eight years after the incident, Mr. Lara argues that a combination of factors call for a reduction in sentence to time served. Specifically, Mr. Lara cites to his youth at the time of the offense, the time that he has spent incarcerated, that a life sentence for someone who did not commit the murder is inappropriate, and his record of rehabilitation. *See* ECF No. 1320 at 1-4. In Mr. Lara's view, these factors, when viewed as a whole, represent extraordinary and compelling reasons on which the Court should release him from his life-without-parole sentence. *Id.*

The Government opposes Mr. Lara's release on these grounds:

> [Mr.] Lara's disciplinary record is not reliably "clean;" he has not proven he can extrapolate Challenge [P]rogram skills to a less structured setting; his honesty is questionable; and his expressions of remorse and responsibility, as well as his rehabilitation, are incomplete. In short, when evaluated in context, none of the reasons [Mr.] Lara offers is either extraordinary or compelling. Given the severity of [Mr.] Lara's crime and his failure to adequately show true remorse or complete rehabilitation, his sentence is just and should not be reduced.

ECF No. 1335 at 6.

The Court first reviews the standard for a sentence reduction pursuant to the statute. The Court then considers whether the facts of Mr. Lara's case meet that statutory standard for a sentence reduction.

Before beginning the analysis, the Court offers a preliminary thought on the language of the statute as it relates to the Court's role. While the informal name of this statutory process, "compassionate release," has become common parlance among the courts (and has been used in congressional records), it does not actually appear in the statute. *See id.* § 3582. The statute speaks of a sentence "reduction." This phrasing is more accurate because granting a motion may result in a reduced

sentence rather than outright release.  See *United States v. Brooker*, 976 F.3d 228, 237 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. [The statute] in fact speaks of sentence reductions.  A district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place.").  Further, terming the grant of a sentence-reduction motion "compassionate" may suggest to some that a judge is making a moral decision driven by conscience rather than a legal decision governed by statute.  While it is true that the statute allows a judge significant discretion in this area, the decision is nonetheless constrained by the text and relevant precedent.  When ruling on a sentence-reduction motion, the Court is still applying law to facts.  For these reasons, the Court refrains from using the term "compassionate release" in the rest of its opinion.

## III.   STANDARD FOR A SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

Mr. Lara seeks a reduction of his term of imprisonment under 18 U.S.C. § 3582(c)(1)(A) ("Modification of an Imposed Term of Imprisonment").[5]  The statute allows courts to reduce the term of imprisonment, after considering the Section 3553(a) sentencing factors, "if it finds that extraordinary and compelling reasons warrant such a reduction."[6]  *Id.*

---

[5] Mr. Lara has met all the administrative remedies and timeliness requirements of the statute before filing his motion. *Id.*

[6] The Court need not recount here the legal analysis of whether the definition of "extraordinary and compelling" is constrained by the United States Sentencing Guidelines when the sentence-reduction motion is filed by a prisoner, because the First Circuit has recently answered that much litigated question. *United States v.*

The first question for the Court in analyzing Mr. Lara's motion is: what constitutes "extraordinary and compelling" reasons to reduce a sentence? The First Circuit very recently gave insight into the answer to this question by counseling that the district court "enjoy[s] broad discretion," and that it should "conduct a holistic review to determine whether the individualized circumstances, taken in the aggregate, present an 'extraordinary and compelling' reason to grant" a sentence reduction. *United States v. Trenkler*, 47 F.4th 42, 47 (1st Cir. 2022). The First Circuit also noted that "the whole may be greater than the sum of its parts, and reasons that might not do the trick on their own may combine to constitute circumstances that warrant a finding that the reasons proposed are, in the aggregate, extraordinary and compelling." *Id.* at 49.

The Court "may consider *any* complex of circumstances raised by a defendant as forming an extraordinary and compelling reason warranting relief." *Id.* at 47 (emphasis added) (quoting *Ruvalcaba*, 26 F.4th at 28 (1st Cir. 2022)). "To serve as a safety valve, section 3582(c)(1)(A) must encompass an individualized review of a defendant's circumstances and permit a sentence reduction—in the district court's sound discretion—based on any combination of factors." *Id.* at 48 (internal quotation marks omitted) (quoting *Ruvalcaba*, 26 F.4th at 26). "[T]he only limitation on what can be considered an extraordinary and compelling reason to grant a prisoner-

---

*Ruvalcaba*, 26 F.4th 14, 21 (1st Cir. 2022) (rejecting the notion that policy guidelines apply to prisoner-initiated motions).

initiated motion is rehabilitation [alone]." *Id.* at 48 (internal quotation marks omitted) (quoting *Ruvalcaba*, 26 F.4th at 25-26).

When Congress established this mechanism for sentence reductions in the Sentencing Reform Act of 1984 ("1984 Act"), the legislative history shows that it wanted courts to be able to reduce "unusually long sentence[s]," and to reduce sentences where amended guidelines suggest a shorter sentence. The Senate report noted:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. 98-225, at 55-56 (1983–1984).

Congress explained that sentence modifications would be proper when "extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the Sentencing Guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment." *Id.* The 1984 Act was thus intended to provide "safety valves" for modification of sentences. *Id.* at 121; *see also United States v. Vigneau*, 473 F. Supp. 3d 31, 36 (D.R.I. 2020) (confirming this legislative history).

7

## IV.   APPLICATION OF THE LAW TO THE FACTS

The Court walks through the statute's requirements in two steps.  It first considers what constitutes an "extraordinary and compelling" reason and whether such reasons are present in Mr. Lara's case.  The Court then turns to a renewed analysis of the 18 U.S.C. § 3553(a) sentencing factors.

### A. <u>Extraordinary and Compelling Reasons</u>

The First Circuit has provided the Court with a helpful introduction to the plain meaning of the phrase "extraordinary and compelling" in the statute.

> The plain meaning of "extraordinary" suggests that a qualifying reason must be a reason that is beyond the mine-run either in fact or in degree. *See Webster's Third New International Dictionary of the English Language Unabridged* 807 (1981) (defining "extraordinary" as "going beyond what is usual, regular, common, or customary"); *see also United States v. Hunter*, 12 F.4th 555, 562 (6th Cir. 2021) (suggesting that such reason must be "most unusual," "far from common," or "hav[e] little or no precedent").  By the same token, the plain meaning of "compelling" suggests that a qualifying reason must be a reason that is both powerful and convincing.   *See Webster's Third, supra* at 462 (defining "compelling" as "forcing, impelling, [or] driving [circumstance]" and as "tending to convince or convert by or as if by forcefulness of evidence"); *see also Hunter*, 12 F.4th at 562.

*United States v. Canales-Ramos*, 19 F.4th 561, 566-67 (1st Cir. 2021) (alteration in original).  The Court will use this explication to analyze the reasons that Mr. Lara claims are extraordinary and compelling, justifying his release; specifically, he cites his youthfulness at the time of the crime, his subordinate role in the crime, a change from mandatory to discretionary Sentencing Guidelines, and an excessively long sentence given his involvement in the crime.  *See* ECF No. 1320 at 1-4.

### 1. Youthful Offender

When Mr. Lara committed the crime for which the Court sentenced him to life without parole,[7] he was a teenager—just eighteen years old.   ECF No. 1320 at 5. Chief Justice Earl Warren's command from over sixty years ago, made about the Eighth Amendment,[8] rings true here: sentencing courts must consider "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).  The sentence necessary to carry out the goals of sentencing— as set forth by Congress—for a youthful offender has evolved considerably over the quarter of a century that Mr. Lara has been incarcerated.

While there is no Supreme Court precedent that examines emerging adults (age eighteen to early twenties[9]) specifically, there is caselaw surrounding sentencing emerging adults that acts as a helpful start.  The Supreme Court has reminded us that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18."[10] *Roper v. Simmons*, 543 U.S. 551, 574 (2005).  "The [Supreme]

---

[7] Under the 1984 Act, Congress ended parole for defendants convicted of federal crimes committed after November 1, 1987.  Pub. L. 100-182, § 2(a), 101 Stat. 1266, 1266.  Therefore, his "life-sentence" had the effect of being a "life-without-parole" sentence.

[8] To be clear, the Court is not analyzing whether the life-without-parole sentence for an eighteen-year-old is unconstitutional in any way.  It is merely reviewing the caselaw to find what the courts have said over time about the comparative culpability of youthful offenders.

[9] *See, e.g.*, Clare Ryan, *The Law of Emerging Adults*, 97 Wash. U. L. Rev. 1131, 1136-42 (2020) (characterizing emerging adults).

[10] "[Y]oung adult offenders aged 18-24 are more similar to juveniles than to adults with respect to their offending, maturation, and life circumstances."  Rolf Loeber, David P. Farrington & David Petechuk, *Bulletin 1: From Juvenile Delinquency to Young Adult Offending*, NAT'L INST. JUST., at 20 (2013), *available at* https://www.ojp.gov/pdffiles1/nij/grants/242931.pdf.

Court affirmed its conclusion [from earlier Eighth Amendment cases] in *Roper* that developmental differences in juveniles make them categorically less culpable than adults. Specifically, it cited their lack of maturity and impulsiveness; limited control over their environment; increased vulnerability to peer pressure; and unformed character." Mariko K. Shitama, Note, *Bringing Our Children Back from the Land of Nod: Why the Eighth Amendment Forbids Condemning Juveniles to Die in Prison for Accessorial Felony Murder*, 65 FLA. L. REV. 813, 815 (2013) (citation omitted). The United States Supreme Court "requires that[,] before sentencing a juvenile to life without parole, the sentencing judge take into account 'how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016) (as revised Jan. 27, 2016) (citing *Miller v. Alabama*, 567 U.S. 460, 480 (2012)).

Importantly, the Supreme Court has said that: "Life without parole is an especially harsh punishment for a juvenile. Under this sentence[,] a juvenile offender will on average serve more years and a greater percentage of his life in prison than an adult offender." *Graham v. Florida*, 560 U.S. 48, 70 (2010) (as modified July 6, 2010).

From 2005 to 2016, the United States Supreme Court issued several decisions banning adult sentences for youthful offenders. In *Roper*, the Supreme Court held that the death penalty for a person under the age of eighteen violated the Eighth

Amendment.[11]   543 U.S. at 578 (reasoning that, because juveniles have lessened culpability, they are less deserving of the most severe punishments).  In so holding, the Supreme Court explained the following:

> Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders.  First, as any parent knows and as the scientific and sociological studies . . . tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions."  It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior." * * *
>
> The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure.  * * * This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment.  ("[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting").
>
> The third broad difference is that the character of a juvenile is not as well formed as that of an adult.  The personality traits of juveniles are more transitory, less fixed.   * * * ("For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled.   Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood").

*Roper*, 543 U.S. at 569-70 (citations omitted).

Five years later, in *Graham v. Florida*, the Supreme Court banned a sentence of life without parole for juveniles convicted of non-homicide crimes.  560 U.S. 48, 82

---

[11] Earlier, in *Thompson v. Oklahoma*, the Supreme Court had concluded that capital punishment for children under the age of sixteen violated the Eighth and Fourteenth Amendments.  487 U.S. 815, 838 (1988).  Many factors explored in those cases that separate adolescents from adults apply to emerging adults as well.

(2010).  In so holding, the Supreme Court clarified its thinking on sentencing juveniles:

> [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.  For example, parts of the brain involved in behavior control continue to mature through late adolescence.  Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults.  It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."  These matters relate to the status of the offenders in question; and it is relevant to consider next the nature of the offenses to which this harsh penalty might apply.

*Id.* at 68-69 (citations omitted).

And two years later in *Miller v. Alabama*, the Supreme Court banned mandatory sentences of life without parole for juveniles convicted of homicide crimes.[12]  567 U.S. 460, 489 (2012).  The Supreme Court reasoned that:

> Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole.  In the circumstances there, juvenile status precluded a life-without-parole sentence, even though an adult could receive it for a similar crime.  And in other contexts as well, the characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate.

*Id.* at 473 (citation omitted).

In these cases, the Supreme Court relied on multidisciplinary scholarship to conclude that juveniles who commit even the most serious or violent crimes can

---

[12] Courts may still within their discretion sentence youth to life without parole in homicide cases, but only after the sentencing court has determined, after a full hearing, that the youth is permanently incorrigible and incapable of rehabilitation. *See id.*

change their behaviors. *See, e.g., Graham*, 560 U.S. at 68-69 ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds."); *Roper*, 543 U.S. at 569 (noting that, as "sociological studies . . . tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young'"). Because of their developmental immaturity, impetuousness, and susceptibility to negative peer influences, children who commit serious crimes are often less culpable than adults, which should be reflected in how they are sentenced. See, e.g., *Roper*, 543 U.S. at 569-70 (fleshing out this point). And because these factors persist in young people generally, these considerations also apply to an 18-year-old youth. *See, e.g., id.* (noting the same).

Other district courts have considered the youthful age of the offender as an element of extraordinary and compelling reasons to grant a sentence reduction. Two such cases also involved members of the Latin Kings. In *United States v. Cruz*, the United States District Court for the District of Connecticut considered a motion for sentence reduction based on a conviction for multiple Violent Crimes in Aid of Racketeering and RICO. Crim. Case No. 3:94-CR-112 (JCH), 2021 WL 1326851, at *1-2 (D. Conn. Apr. 9, 2021). Mr. Cruz was a member of the Latin Kings, who at eighteen years old and under orders from a gang leader, shot a fellow Latin Kings member twice in the head from the rear passenger seat of a car. *Id.* at *1. The court considered the time served by Mr. Cruz thus far (about twenty-five years), his youth at the time of the offense, and his extraordinary rehabilitation. *Id.* at *7-8. A

psychological expert testified that late adolescents suffer from "problems with impulse control and self-regulation and heightened sensation-seeking, which would make them in those respects more similar to somewhat younger people than to older people." *Id.* at *6 (internal quotation marks omitted) (citation omitted). "The scientific evidence therefore demonstrates that 18-year-olds display similar characteristics of immaturity and impulsivity as juveniles under the age of 18." *Id.* The court found that "because 18-year-olds are still developing in terms of maturity, impulse control, ability to resist peer pressure, and character, they are less than fully blameworthy for criminal conduct." *Id.* at *7. So, the court granted Mr. Cruz's Motion for a Sentence Reduction. *Id.* at *15.

In *United States v. Rios*, the court had sentenced Hector Luis Rios, a twenty-seven-year-old member of the Latin Kings with six prior felony convictions, to three concurrent terms of life imprisonment for a "cold-blooded murder." Crim. No. 3:94CR112 (JBA), 2020 WL 7246440, at *1, 3 (D. Conn. Dec. 8, 2020) ("Mr. Rios planned this murder, acting not on impulse or on orders from others, but rather with the hard heart of a calculated killer . . . ."). But the court later granted Mr. Rios' motion for sentence reduction after he served twenty-six years of his life sentence. *Id.* at *6. It found that his continued risk to the public, if released, appeared to be markedly reduced given that recidivism declines with age. *Id.* at *4. The court began by pointing out that "the average sentence imposed for murder is 255 months [about 22 years]." *Id.* The court then noted that "other defendants convicted of both capital

14

and other violent crimes and sentenced to life have been released by district courts."[13] *Id.* at \*5.

In *United States v. Ramsay*, a jury convicted Mr. Ramsay of murder in aid of racketeering for shooting into a crowd as part of a gang dispute. 538 F. Supp. 3d 407, 411-12 (S.D.N.Y. 2021). The United States District Court for the Southern District of New York sentenced Mr. Ramsay—who was eighteen years old when he committed the crime—to life in prison. *Id.* at 409-11. But the court later considered the relative immaturity, susceptibility, salvageability, and dependability of adolescent defendants as part of the extraordinary and compelling reasons that called for a sentence reduction. *See id.* at 417-23. Looking at dependability (i.e., the ability to be trustworthy or reliable), the court found that adolescents lack the autonomy granted to adults. *See id.* at 422-23. Once teenagers reach legal adulthood at eighteen, most

---

[13] The Court cited to the following extensive list of cases in support of its decision:

> *See United States v. Fisher*, 2020 WL 5992340 (S.D.N.Y. Oct. 9, 2020) (reducing a life sentence for involvement with a violent narcotics ring to time-served in light of defendant's admirable rehabilitation and the COVID-19 pandemic); *United States v. Tidwell*, No. CR 94-353, 2020 WL 4504448, at \*11 (E.D. Pa. Aug. 5, 2020) (releasing a man serving a life sentence for, among other things, two counts of murder in furtherance of a continuing criminal enterprise); *United States v. Curtis*, 2020 WL 1935543, at \*1 (D.D.C. April 22, 2020) (releasing defendant under § 3582(c)(1)(A) despite his six concurrent terms of life for operation of a sex-trafficking ring involving minors); *United States v. Williams*, 2020 WL 1751545, at \*3 (N.D. Fla. Apr. 1, 2020) (granting release and reducing a life sentence for conviction of armed robbery because defendant's health concerns were serious enough that "an outbreak of COVID-19 in [Defendant's] facility would likely have fatal consequences for him."

*Id.* at \*5.

emerging adults still rely on caregivers for financial and emotional support. *See id.* And often they are still in high school. Turning to salvageability, the court emphasized the evolving character of emerging adults leading to a higher likelihood of reformation. *Id.* at 422. Likewise, most emerging adults who have committed crimes tend to cease that behavior as they age. *Id.* The Court granted that defendant's motion for sentence reduction.[14] *Id.* at 429.

Over the last two decades, scientists, society, and the courts have all recognized that youthful offenders have a different level of culpability than do adult offenders. This realization is especially true when the youthful offender receives an irrevocable sentence of life imprisonment. As the Tennessee Supreme Court reminded us in striking down a sentence for a youthful offender, "[y]outh matters in sentencing," and "children are constitutionally different from adults for purposes of sentencing." *Tennessee v. Booker*, 656 S.W.3d 49, 60, 63 (Tenn. 2022) (internal quotation marks omitted) (citation omitted).

---

[14] *See also* Michael T. Hamilton, *Opening the Safety Valve: A Second Look at Compassionate Release Under the First Step Act*, 90 FORDHAM L. REV. 1743, 1766 (2022) (citations omitted)

> At least three circuit courts—the Second, Fourth, and Tenth—have indicated that a defendant's relative youth at the time of an offense may contribute to a finding of extraordinary and compelling circumstances. District courts in a number of other circuits have reached the same conclusion. Few courts, however, have addressed exactly how such a factor should be considered. A recent decision from the Southern District of New York offers perhaps the most in-depth analysis of how—and why—an offender's youth matters to the § 3582(c)(1)(A) inquiry. In *United States v. Ramsay*, Judge Jed S. Rakoff found that the defendant's youth at the time of the offense, in combination with other reasons, amounted to extraordinary and compelling reasons for release.

Mr. Lara was eighteen years old when he committed the crime.  ECF No. 1320 at 1.   In the past two decades, science, medicine, and legal thought have all underscored that youthful offenders are less culpable than older adults because their brains are less developed in critical areas.  This new professional consensus and all the reasons for which courts impose sentences for criminal behavior support a less-than-life-sentence when it involves a youthful offender.  Mr. Lara's youth at the time he committed the crime is an extraordinary and compelling reason to consider a sentence reduction.

### 2. Non-Trigger Felony Murder

The jury acquitted Mr. Lara of both Count One (RICO, which included the murder of Temujin Vandergroen) and Count Two (Conspiracy to Commit Racketeering).  *See* ECF Nos. 731, 904 at 1 ("The defendant has been found not guilty on count(s) 1, 2, 3[,] and 10").  And on the Act of Racketeering One (which included conspiracy to murder and rob Temujin Vandergroen), the jury found that the Government did not prove that a racketeering act had occurred.  ECF No. 731 at 1.

For the same reasons that the caselaw supports sentencing emerging adults differently in general, courts should be doubly concerned with sentencing emerging adults based on conduct that they did not commit—even though the law otherwise allows such a practice.  *See, e.g.*, Nazgol Ghandnoosh, Emma Stammen & Connie Budaci, *Felony Murder: An On-Ramp for Extreme Sentencing*, SENT'G PROJECT, at 14 (2022) ("Emerging adults experience continued psychosocial development, and have many of the same cognitive vulnerabilities as minors that diminish their culpability.

Based on these similarities, emerging adults should be included in measures that seek to end or restrict the application of the felony murder rule to young people.").

In *Graham*, the Supreme Court held that juvenile defendants who did not kill or intend to kill have a "twice diminished moral culpability" (due to their age and not having killed) and are therefore less deserving of extreme punishment. *Graham*, 560 U.S. at 69. The Supreme Court "recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* (citing *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008); *Tison v. Arizona*, 481 U.S. 137 (1987); *Enmund v. Florida*, 458 U.S. 782 (1982); *Coker v. Georgia*, 433 U.S. 584 (1977)).

There are also many scholars—supported by ample caselaw from across the country—who assert that felony-murder convictions should not result in a sentence of life without parole.[15] *Arrington v. State*, 113 So. 3d 20, 26 (Fl. Dist. Ct. App. 2012), *review denied*, 104 So. 3d 1087 (Fla. 2012) ("[S]tatutorily mandated life-without-

---

[15] *See also, e.g.*, Ghandnoosh, Stammen & Budaci, *supra*, at 8 (citations omitted)

> Foreign jurisdictions increasingly recognize felony murder laws as violating the fundamental principles of justice and of proportionality. The United Kingdom, where the felony murder rule originated and subsequently spread to other Commonwealth countries and the United States, abolished felony murder starting as early as 1957. Other countries followed suit in the 1960s, including the Republic of Ireland, Antigua and Barbuda, Barbados, and Tuvalu. In 1990, the Canadian Supreme Court also eliminated felony murder, underscoring "the principle of fundamental justice that subjective foresight of death is required before a conviction for murder can be sustained," which, in the Court's opinion, is necessary to "maintain a proportionality between the stigma and punishment attached to a murder conviction and the moral blameworthiness of the offender."

parole sentence for felony murder may lead to grossly disproportionate sentences in some cases."); *Kills On Top v. State*, 928 P.2d 182 (Mont. 1996) (imposition of death sentence based on felony murder in this defendant's case was disproportionate); Emily C. Keller, *Constitutional Sentences for Juveniles Convicted of Felony Murder in the Wake of Roper, Graham & J.D.B.*, 11 CONN. PUB. INT. L.J. 297, 302-06, 315-16 (2012); Shitama, *supra*, at 840-48 (2013); Richard W. Garnett, *Depravity Thrice Removed: Using the "Heinous, Cruel, or Depraved" Factor to Aggravate Convictions of Nontriggermen Accomplices in Capital Cases*, 103 Yale L.J. 2471, 2493-99 (1994); Richard A. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death*, 31 B.C. L. REV. 1103, 1113-17 (1990); Lily Kling, Note, *Constitutionalizing the Death Penalty for Accomplices to Felony Murder*, 26 Am. Crim. L. Rev. 463, 463-64, 482 (1988); Lynn D. Wittenbrink, Note, *Overstepping Precedent? Tison v. Arizona Imposes the Death Penalty on Felony Murder Accomplices*, 66 N.C. L. REV. 817, 833-36 (1988).

In a felony-murder case, the law's transfer of intent from the felony that was committed by that defendant to the murder that was not committed by that defendant is particularly inappropriate for a minor because "the ability to consider the full consequences of a course of action and to adjust one's conduct accordingly is precisely what we know juveniles lack capacity to do effectively." *Miller*, 567 U.S. at 492 (Breyer, J., concurring). As one scholar artfully phrased the issue:

> Few legal doctrines have been as maligned and yet have shown as great a resiliency as the felony-murder rule. Criticism of the rule constitutes a lexicon of everything that scholars and jurists can find wrong with a legal doctrine: it has been described as "astonishing" and "monstrous,"

19

an unsupportable "legal fiction," "an unsightly wart on the skin of the criminal law," and as an "anachronistic remnant" that has "no logical or practical basis for existence in modern law."

Nelson E. Roth & Scott E. Sundby, *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 CORNELL L. REV. 446, 446 (1985) (citations omitted).

And as another commentator noted:

> Because of its egregious disregard of some of the most basic principles of criminal justice, it is an understatement to say that the felony-murder rule "is a much-condemned doctrine." Among its most compelling criticisms are the arguments that both its deterrent and retributive justifications fail, and that because it seeks to punish an offender for harm he did not intend, it inevitably results in disproportionate punishment. And yet almost every state prosecutes both children and adults for felony murder.

Shitama, *supra*, at 843-844 (citations omitted).

Mr. Lara did not bring the gun into the car when George Perry shot and killed Mr. Vandergroen. *See Lara*, 181 F.3d at 201 (noting that Mr. Perry brought the gun into the car). And it is undisputed that Mr. Lara did not pull the trigger that killed Mr. Vandergroen. *See* ECF No. 958 at 5-6. Mr. Perry was the shooter and trigger person. Postconviction Order V at *1. The First Circuit described Mr. Lara and Mr. Perry's involvement as follows:

> [Perry] asked Lara to accompany him while he relieved Vandergroen of his Ford Escort (which was adorned with tire rims that Perry fancied). * * * The two men asked Vandergroen to take a ride with them. When he agreed, Perry (who had brought along a sawed-off shotgun) sat behind Vandergroen in the car, while Lara sat in the front passenger seat. At Perry's request, Vandergroen drove to a deserted neighborhood. Perry then told Vandergroen to slow or stop the vehicle, and, when Vandergroen complied, Perry shot him. Perry and Lara shoved Vandergroen's body into the street and returned to a Latin King hangout, where they were seen with blood and brain matter on their clothing. The two later burned and abandoned the car. * * * There were

conflicting accounts of Lara's participation in the carjacking, and the jury was free to decide which, if any, to believe. * * * [T]he jury acquitted Lara, but convicted Perry, on several counts, including the charge of using or carrying a firearm during the Vandergroen carjacking.

*Lara*, 181 F.3d at 201-02.

Importantly, the jury found Mr. Lara not guilty of the murder of Mr. Vandergroen and not guilty of any violent crime in aid of racketeering. *See* ECF Nos. 731, 904. The Government conceded that "[Mr.] Lara was only in it for robbery." ECF No. 958 at 5-6.

The Court sentenced both Mr. Perry and Mr. Lara to life without parole despite the differences in their culpability. *See Lara*, 181 F.3d at 190. It is an understatement to say that Mr. Perry and Mr. Lara have vastly distinct levels of culpability for the murder of Temujin Vandergroen. This is a case in which a "mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of th[is] case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community." *Bear Cloud v. State*, 334 P.3d 132, 146 n. 13 (Wyo. 2014) (internal quotation marks omitted) (citing *People v. Miller*, 781 N.E.2d 300 (Ill. 2002)). That Mr. Lara did not murder Mr. Vandergroen (and that he received the same sentence as the person who did) is another extraordinary and compelling reason to consider a sentence reduction.

### 3. Length of the Original Sentence

"Extreme sentences imprison people who have aged out of their crime-prone years. The age-crime curve is a longstanding and well-tested concept in criminology,

depicting the proportions of individuals in various age groups who are engaged in criminalized activity." Ghandnoosh, Stammen & Budaci, *supra*, at 7 (citing Rolf Loeber & David Farrington, *Age-Crime Curve*, in ENCYCLOPEDIA OF CRIMINOLOGY AND CRIM. JUST. 12-18 (Bruinsma & D. Weisburd Ed. 2014)). "Because people generally age out of crime, those who have been imprisoned for violent crimes and have served lengthy sentences are among the least likely to recidivate when released from prison." *Id.*

Several commentators and scholars over time have criticized sentences of life without parole both in the United States and abroad. To elucidate these criticisms, consider these examples:

> Norway is best known—in some circles notorious—for capping the maximum sentence for any crime at twenty-one years. That includes the case of Anders Breivik, convicted for the murder of sixty-nine young people and eight others at a Workers' Youth League summer camp in 2011. Germany outlawed LWOP [life without parole] in 1977. The Federal Constitutional Court argued that "rehabilitation is constitutionally required in any community that establishes human dignity as its centerpiece"—which the German constitution does. Thus, "a humane enforcement of life imprisonment is possible only when the prisoner is given a concrete and realistically attainable chance to regain his freedom . . . ." In 2013, the European Court of Human Rights decided that LWOP violated Article 3 of the European Convention of Human Rights, which prohibits "inhuman or degrading treatment or punishment."

Judith Lichtenberg, *Against Life Without* Parole, 11 WASH. U. JURIS. REV. 39, 43-44 (2018).

Long sentences also do not necessarily deter crime effectively. As Daniel Nagin—a professor at Carnegie Mellon University and a leading national expert on deterrence—has written: "Increases in already long prison sentences, say from 20

years to life, do not have material deterrent effects on crime." Daniel S. Nagin, *Guest Post: Reduce Prison Populations by Reducing Life Sentences*, WASHINGTON POST (Mar. 21, 2019), https://www.washingtonpost.com/crime-law/2019/03/21/guest-post-reduce-prison-populations-by-reducing-life-sentences/; *see also* Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both Be Reduced?*, CRIMINOLOGY & PUB. POL'Y, Vol 10(1), at 13-15 (2011) (concluding that "[t]he marginal deterrent effect of increasing already lengthy prison sentences is modest at best").

Additionally, courts in other districts have found that unusually long sentences by today's standards could be an "extraordinary and compelling" reason to reduce a sentence. *See, e.g.*, *United States v. Urkevich*, 8:03CR37, 2019 WL 6037391, at *2, *4 (D. Neb. Nov. 14, 2019) (the sentence imposed is much longer than the sentence he likely would have received under the law as it now exists); *United States v. Cantu-Rivera*, Cr. No. H-89-204, 2019 WL 2578272, at *2 (S.D. Tex. June 24, 2019) (court factored in the lower sentence under changed sentencing policy); *United States v. Brown*, 411 F. Supp. 3d 446, 452 (S.D. Iowa 2019), *amended on reconsideration*, 457 F. Supp. 3d 691 (S.D. Iowa 2020) (defendant faced a sentence far longer than he would ever receive under modern law).

In fiscal year 2021 (the most recent year for which this source provides data), the median federal sentence for murder was 231 months (about nineteen years), and in the First Circuit it was 194 months (about sixteen years). *Distribution of Sentence Length*, U.S. SENT'G COMM'N, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed Feb. 10, 2023). Mr. Lara's sentence of life is disproportionate to the

median sentence for murder in this country and in this Circuit. Life without parole is an extreme sentence–the harshest sentence a court can impose short of death. Mr. Lara's excessively long sentence is one more extraordinary and compelling reason to consider a sentence reduction.

### 4. Changed Circumstances: Guidelines No Longer Mandatory

Consistent with the then-mandatory Sentencing Guidelines, the Court sentenced Mr. Lara to life in 1997. Postconviction Order V at *1. In 2005, the United States Supreme Court ruled that district courts are empowered, at their discretion, to consider how a defendant's circumstances may call for imposing a sentence either above or below the guideline range. *See United States v. Booker*, 543 U.S. 220, 248-53, 264-65 (2005). In other words, following *Booker*, the Sentencing Guidelines are no longer mandatory. *Id.* (Although, a sentence must still follow any statutory requirements.) *See id.* In sentencing Mr. Lara, the Court believed that it could not have considered a sentence outside life. ECF No. 958 at 14-16 (denying Mr. Lara's motion to apply a downward departure under U.S.S.G. § 2 A. 1.1, Application Note 2(B)). It is now proper for the Court to consider the fact that the guidelines have changed—from mandatory to discretionary—in deciding whether to grant Mr. Lara a sentence reduction. S. Rep. No. 98-225 at 121 (noting the "the availability of specific review and reduction of a term of imprisonment * * * and to respond to changes in the guidelines."). Changed Sentencing Guidelines serve as another extraordinary and compelling reason to consider a sentence reduction.

### 5. Rehabilitation

Rehabilitation alone cannot be a basis for granting a sentence reduction. 28 U.S.C. § 994(t) ("Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."). But it can be an element that the Court considers in its "holistic review to determine whether the individualized circumstances, taken in the aggregate," present extraordinary and compelling reasons to grant a sentence reduction. *Trenkler*, 47 F.4th at 47.

Mr. Lara has made significant strides in bettering himself through education, career development, and treatment. *See, e.g.*, ECF No. 1320 at 27-28 (bulleting several of Mr. Lara's key accomplishments). Mr. Lara has completed 9,000 hours of Bureau of Prison ("BOP") programming, including 8,000 hours of training as a dental lab technician and an added 2,000 hours of work as a dental lab technician. ECF No. 1320 at 42. He has worked for years in prison food services, where he has received strong evaluations. *Id.* Mr. Lara also has authored several books. His two children's books are titled: *Long Live Larry the Lizard* (ECF No. 1320-15) and *The Central Park Zoo* (ECF No. 1320-16). His business-related book is titled: *Momentum Trading* (ECF No. 1320-17). And his self-help book is titled: *I Believe Therefore I Am* (ECF No. 1329-18), which recounts the paradigm shift that Mr. Lara underwent while incarcerated.

Since 2019, Mr. Lara has been an active participant in the BOP's "Challenge Program" at United States Penitentiary Pollock, which serves as "a modified therapeutic community" that "is intended for men interested in making positive

lifestyle changes." ECF No. 1320-20 at 1. He joined the program "to learn how to be part of a community," and "to work on sobriety as not to relapse." *Id.* at 1-2.

Mr. Lara also states that he has renounced his membership in the Latin Kings. His brief notes:

> Unlike many young men who join gangs upon entering prison, Mr. Lara did the opposite–he renounced his Latin Kings membership 20 years ago. He even went as far as to burn a Latin Kings tattoo off his forearm with a scorching hot clothes iron (leaving an extensive scar) to prove to all who questioned his status that he was no longer affiliated with the Latin Kings. Doing so put him at great physical peril in the prison in which he was held at the time because of its heavy Latin Kings presence.

ECF No. 1320 at 20 (citations omitted). Although the Government conveys some skepticism of Mr. Lara's renunciation, it does not dispute that there is no sign that he has been involved in any Latin Kings activity while in prison in the last 20 years.

Over his twenty-eight years of incarceration, the Government describes Mr. Lara's behavior as "inconsistent," pointing to nineteen disciplinary infractions over twenty-three years, starting in 1995 and ending in 2018. ECF No. 1335 at 12. A review of the disciplinary matters shows that most appear to have arisen from Mr. Lara's drug addiction and his initial difficulties acclimating to a life in prison. *See* ECF No. 1340 at 19-20. Mr. Lara has been discipline-free since 2018, the date on which he became sober. *See id.* at 20. And he readily admitted to his shortcomings in many of the disciplinary hearings.[16] *See, e.g.,* ECF No. 1332-1 at 4, 8, 11, 14

---

[16] Other than the drug and alcohol issues, Mr. Lara's disciplinary charges included possession of an adapter for an MP3 player, possessing a hazardous tool, "tattooing or self-mutilating," and refusing to obey an order. *See* ECF No. 1332-1 at 3-7.

(internal quotation marks omitted) (stating: "I did it [assaulted another inmate over eight years ago]"; "I am an addict and I was using. I am guilty;" "Yes I had it, I messed up;" and "Yes I messed up, it is mine. I was drinking a little to celebrate.").

The Government further cites to a litany of conduct that shows that Mr. Lara has not been rehabilitated. *See* ECF No. 1335 at 11-18 (detailing conduct). Among others, the Government cites these examples: Mr. Lara has not gone through the formal BOP process for exiting a gang; his evaluations from the Challenge Program demonstrate that he would not have the social skills necessary for life outside prison; he appears to have plagiarized an existing text on financial analysis in writing his own financial advice book; and BOP has not, at any point, transferred him to a lower security prison facility as a "reward" for his "rehabilitative progress." *Id.* In short, the Government argues that Mr. Lara's "rehabilitation is far from complete." *Id.* at 1.

But nowhere does the law require complete rehabilitation—if such a concept even exists. Rehabilitation is a process that takes time and is often met with bumps along the road. Mr. Lara is still human; prison has not made him perfect. Further, many of the Government's concerns have already been assuaged or mitigated by the above evidence that Mr. Lara has proffered. Even considering the Government's contentions, the Court finds that the rehabilitation that Mr. Lara achieved in prison is extraordinary and compelling (especially considering that Mr. Lara undertook these rehabilitative efforts expecting that he would still be serving a life sentence). Because rehabilitation is only one reason—and cannot be the only reason—the Court

further finds that Mr. Lara's rehabilitative efforts and successes contribute to the extraordinary and compelling reasons that may justify reducing his sentence.

### 6. Conclusion on Extraordinary and Compelling Factors

Times have changed in how society and the law think about incarceration. This change largely comes from the recent focus on the fact that the United States maintains a grossly disproportionate percentage of the world's incarcerated population compared to its percentage of the world's total population. *See United States v. Polouizzi*, 760 F. Supp. 2d 284, 285-86 (E.D.N.Y. 2011) (citing, *inter alia*, Glenn C. Loury & Bruce Western, *The Challenge of Mass Incarceration in America*, in DAEDALUS: J. OF AM. ACAD. OF ARTS AND SCIS. (2010)) ("With roughly 5 percent of the world's population, the United States currently confines about 25 percent of the world's prison inmates.").

Mr. Lara's case is replete with extraordinary and compelling reasons that merit reduction of his 1997 life-without-parole sentence. Mr. Lara was a teenager when he committed the crime, he was not the trigger person, his sentence was not proportional to the others who were more culpable, his sentence was unusually long, and he has shown commendable rehabilitation since being incarcerated. The unique aspects of his life at the time the Court sentenced him and the changes in thought that have taken place during the last quarter of a century in the law and society about what is sufficient, but not more than necessary to accomplish the sentencing goals compels the Court to grant the request to modify his sentence.

The Court now turns to the sentencing factors to decide what the proper sentence should be, considering Mr. Lara's current circumstances.

### B. 18 U.S.C. § 3553(a) Sentencing Factors

Once the Court finds extraordinary and compelling reasons to reduce a sentence, it must then consider what the appropriate sentence is under the Section 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A). Congress has instructed the courts to impose a sentence that is "sufficient, but not greater than necessary" to carry out the purposes of sentencing. *Id.* § 3553(a). The purposes of sentencing are familiar to all, so the Court summarizes them as requiring a court to consider the following: the "nature and circumstances of the offense and the history and characteristics of the defendant;" respect for the law and punishment; individual and public deterrence; rehabilitation;[17] and avoidance of unwanted discrepancies. *Id.*

#### *1. History and Characteristics of the Defendant*

The Court begins with Mr. Lara's history and characteristics. Mr. Lara did not grow up in a supportive environment. *See* Presentence Investigation Report of Giovanni Lara at 11-12. He had many adverse childhood experiences. *See, e.g., id.* at 12 ("Because of the absence of his father, [Mr. Lara's] mother worked two jobs to support her only son."). In eighth grade, Mr. Lara "had all failing grades."[18] *Id.* At seventeen, Mr. Lara's behavior was so disruptive that his mother went to the police

---

[17] Because the Court has already evaluated Mr. Lara's rehabilitation, it need not retread that ground here. *See supra* Part IV.A.5. Suffice it to say that Mr. Lara has made extraordinary efforts toward rehabilitating himself.

[18] Mr. Lara obtained his High School Equivalency Diploma while incarcerated. ECF No. 1320 at 70.

to file a disobedient petition. *Id.* at 12. That year, Mr. Lara suffered trauma when he was shot twice in his right calf, leaving his left ankle scarred. *Id.* At an early age, Mr. Lara began regularly smoking cannabis, and he often consumed large amounts of alcohol. *Id.* He never received treatment for his substance addictions. *Id.* His criminal activity began as early as fifteen when he stole a car, followed by a series of petty larceny crimes. *Id.* at 8-11. At age seventeen, he pleaded *nolo contendere* to possession of a controlled substance, which was followed by pleading *nolo contendere* to carrying a pistol without a license. *Id.* at 9. And the next year he also pleaded *nolo contendere* to vandalism. *Id.* at 10. He received a jail sentence (of two years) for the charge of carrying a pistol without a license. *Id.* at 9.

With these facts as a backdrop, Mr. Lara joined the Latin Kings when he was a teenager. *Id.* As one commentator has noted:

> Today, a host of reasons push many young men of color toward gang life. The most significant risk factor is socioeconomic status, which often manifests in the form of almost complete joblessness.
>
> * * *
>
> A variety of other factors also contribute to gang membership. Youth not only face joblessness, but they also experience "family disorganization and lack of parental figures in the home." Specifically, the environment in which these young people are socialized carries many risk factors: presence of drugs and guns, homes broken by parental separation and drug use, decreased educational drive, low self-esteem and, perhaps most importantly, "inconsistency of policing practices" that "create[s] 'an atmosphere of danger on the streets.'" These risks are underscored by a lack of role models to help youth avoid the pitfalls of gang life and, consequently, many turn to gangs to fill this void.

Kathryn Kizer, *Behind the Guise of Gang Membership: Ending the Unjust Criminalization*, 5 DePaul J. Soc. Just. 333, 343-45 (2012) (citations omitted).

And as the United States Department of Justice has described:

> Youth reported the following reasons for joining a gang, in the order of descending importance [citation omitted]: For protection. For fun. For respect. For money. Because a friend was in the gang. These are the typical gang attractions that youth acknowledge. Of these reasons, youth most commonly join gangs for the safety they believe the gang provides.

James C. Howell, *Gang Prevention: An Overview of Research and Programs*, OFF. JUV. JUST. DELINQUENCY PREVENTION, U.S. DEP'T JUST., at 4 (Dec. 2010).

Mr. Lara was a troubled youth who had suffered from gun violence and had begun on a path of addiction at the time he committed this crime. His decision to join a gang at a youthful age, although foolhardy, also reflects societal forces much bigger than him. Given what the scholarship reports and what the law dictates, nothing in Mr. Lara's history suggests a need for him to serve more than the 28 years he has already been imprisoned.

### 2. Nature and Circumstances of the Crime

The Court next turns to the nature and the circumstances of the crime. As Mr. Lara now recognizes, "the nature and circumstances of his offenses were objectively deplorable and deserving of harsh condemnation." ECF No. 1340 at 25. A young person, Temujin Vandergroen, needlessly lost his life and his family will forever live with the horrors of that tragedy. *See* ECF No. 1335 at 18-19 (describing the family's pain and suffering). However, the jury found Mr. Lara *not guilty of the murder* of Mr. Vandergroen. *See* ECF Nos. 731, 904. It did find him guilty of carjacking, the crime that resulted in the death of Mr. Vandergroen. Postconviction Order V at *1. But the evidence at trial showed that Mr. Lara did not bring the gun into the car. *See*

31

*Lara*, 181 F.3d at 201 (noting that it was Mr. Perry who had brought the gun into the vehicle). There is no evidence that Mr. Lara knew Mr. Perry brought the gun into the car. Mr. Lara did not pull the trigger. *See id.* While he took part in the crime that resulted in Mr. Vandergroen's death, Mr. Lara did not perpetrate the murder itself. *See id.* Accordingly, Mr. Lara is not as culpable for an offense that the jury found he did not commit. And as the Court explains in the following section, twenty-eight years imprisonment is sufficient punishment for the crimes of which the jury did find Mr. Lara guilty.

### 3. *Respect for the Law; Punishment and Individual and Public Deterrence*

Twenty-eight years spent in high-security federal prisons is a severe punishment, as it should be in this case. The evidence shows that twenty-eight years in prison for Mr. Lara will have the necessary deterrent effect. First, as another district court has noted, "[t]he positive correlation between age and recidiv[i]sm is impossible to deny." *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005); *see also Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, U.S. SENT'G COMMM'N, at 12 (2004) ("Recidivism rates decline relatively consistently as age increases."). Mr. Lara is now forty-seven years old. Additionally, as one scholar has noted,

> one study shows that those released from life sentences were "less than one-third as likely as all released offenders to be rearrested within three years of release from prison." The reason for this seemingly paradoxical fact may be at least partly that those released had already served long sentences and were no longer young. In any case, from the point of view of both specific deterrence and incapacitation, LWOP sentences make little sense.

Lichtenberg, *supra*, at 48 (citations omitted).  Although Mr. Lara's disciplinary record while incarcerated has not been perfect, his past "infractions are wholly inconsistent with his character as reported by his family, fellow inmates[,] and even the BOP staff who wrote about his involvement with and growth because of his participation in the 'Challenge Program.'"  ECF No. 1320 at 63.

Moreover, the Court need only find that Mr. Lara's term of imprisonment to date is sufficient (or determine that a sentence of a particular number of years would be sufficient were it not to ultimately find that twenty-eight years is a sufficient sentence for Mr. Lara).  *See* 18 U.S.C. § 3553(a).  And several cases that involve even more serious crimes support this conclusion.  *See, e.g., United States v. Perez*, Crim. No. 3:02CR7 (JBA), 2021 WL 837425, at *1 (D. Conn. Mar. 4, 2021) (reducing a life sentence to time served for a defendant whom the jury found guilty of four crimes that related to a murder); *United States v. Fisher*, 493 F. Supp. 3d 231, 232-36 (S.D.N.Y. 2020) (reducing a life sentence to time served for a defendant whom the jury convicted of four murders, among various other crimes); *United States v. Tidwell*, 476 F. Supp. 3d 66, 68 (E.D. Pa. 2020) (reducing a life sentence to time served for a defendant who pleaded guilty to two counts of murder, among various other crimes). And as previously shown, two different federal judges in Connecticut released former Latin King members after they served about twenty-five years in prison.  *See United States v. Cruz and United States v. Rios*, *supra*, Part IV.A.1.

Based on the earlier cases and scholarship discussed, the Court finds that a prison term of twenty-eight years in Mr. Lara's case will engender respect for the law and serve as sufficient deterrence for both Mr. Lara and the public.

### 4. *Avoidance of Unwanted Discrepancies*

When sentencing a defendant, a court must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Over the past couple of decades, the First Circuit has considered the sentencing of defendants involved in carjackings that precipitated deaths. The Court highlights a couple of examples here. In *United States v. Rodríguez-Adorno*, the First Circuit upheld a 180-month (fifteen years) sentence for a defendant who took part in a carjacking that precipitated a murder. 695 F.3d 32, 37 (1st Cir. 2012). In *United States v. Ubiles-Rosario*, the First Circuit upheld a 365-month (almost thirty and a half years) sentence for a defendant who *committed* a murder while taking part in a carjacking (although he did not specifically plead guilty to a murder count). 867 F.3d 277, 280 (1st Cir. 2017). Notably in *Ubiles-Roasario*, the other defendant (whose case was not at issue in the appeal) who took part in the carjacking but did not commit the murder received a much lower sentence of 144 months (twelve years). *Id.* at 291.

Recent statistics confirm that these cited cases are not anomalies. As mentioned, in fiscal year 2021, the median federal sentence for murder was 231 months (about nineteen years), and in the First Circuit it was 194 months (about sixteen years). *Distribution of Sentence Length, supra* Part IV.A.4. Mr. Lara has

34

thus already served more time in prison than the average federal murder sentence from fiscal year 2021. And comparable First Circuit cases have upheld much more lenient sentences. Given these similarly situated (and at least one not-so-similarly situated) cases, the Court would be propagating a sentencing discrepancy by allowing Mr. Lara to continue to serve the rest of his term of life imprisonment.

In response, the Government points to qualitative differences between this case and others when the court chose a more lenient sentence and urges that this Court refrain from relying too heavily on statistics. ECF No. 1335 at 19-22. But the Court only uses statistics as one relevant source of information. And the Government has provided no justification to disclaim any reliance on statistics. The Government's argument more so seems to focus on the fact that Mr. Lara did not plead guilty and that Mr. Lara's life sentence was not necessarily mandatory at the time that it was handed down. *Id.* Even accepting *arguendo* that defendants who plead guilty should be sentenced more leniently, the Court is troubled by the notion that an eighteen-year-old defendant should be sentenced to die behind bars because that defendant was not then ready to accept responsibility and exercised the Sixth Amendment right to trial by jury. Otherwise, the biggest qualitative difference raised by the Government appears to be a finding by the trial judge that Mr. Lara perjured himself. ECF No. 1335 at 3 (citing ECF No. 955 at 3-5, 13-14). The Court reiterates that an added act like committing perjury—although serious—is not significant enough in this case to merit a sentence over twenty-eight years, and certainly not significant enough to, even partially, justify a life sentence. As for the other qualitative

differences that the Government highlights, the Court has discussed these issues at length in earlier sections of this opinion and finds that none of them is significant enough to warrant a life sentence. *See supra* Part IV.A. Accordingly, the Court concludes that it would be propagating a sentencing disparity by allowing Mr. Lara to continue to serve his sentence of life imprisonment.

### 5. *Conclusion on the 18 U.S.C. § 3553(a) Sentencing Factors*

All the Section 3553(a) sentencing factors support reducing Mr. Lara's sentence to the twenty-eight years that he has served. Mr. Lara's background and the nature and circumstances of the criminal conduct do not suggest a need for him to serve further time in prison. Mr. Lara has shown growth and rehabilitation during his time in prison. And given the current state of sentencing, the Court would be creating a serious sentencing discrepancy by allowing Mr. Lara to continue to serve his life sentence. The Court thus finds that a sentence of time served would accomplish the statutory sentencing objectives in Mr. Lara's case.

## V.   CONCLUSION

A life sentence without parole (predicated on felony murder) for a teenager whom the jury acquitted of the murder is unwarranted by today's standards. The Court has "conduct[ed] a holistic review to determine whether the individualized circumstances, taken together, present an 'extraordinary and compelling' reason to grant" the relief. *United States v. Trenkler*, 47 F.4th 42, 47 (1st Cir. 2022). Extraordinary and compelling reasons support reducing Mr. Lara's sentence.

In considering this matter, the Court does not forget what acts were committed in the past. It is not lost on the Court that a young person was murdered in cold blood. This Court's only function here is to apply the law to the facts. And this Court finds that the facts of Mr. Lara's case meet the legal standard for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), nothing more.

The Court GRANTS Mr. Lara's Motion for a Sentence Reduction (ECF No. 1320) and reduces his sentence to time served on Count 8, to be followed by five years of supervised release as to Count 8 and three years of supervised release as to Count 9, to run concurrent to the term of supervised release imposed as to Count 8.

In addition to the standard conditions of supervised release, the following special conditions are also ordered. Mr. Lara shall:

(1) live at a Residential Reentry Center, preferably the Houston House in Pawtucket, Rhode Island, for the first 6 months of supervised release. While at the facility, Mr. Lara must comply with all its policies, procedures, and regulations;

(2) participate in a program of mental health treatment, as directed and approved by the Probation Office;

(3) participate in a program of substance use treatment (inpatient or outpatient), as directed and approved by the Probation Office;

(4) participate in a program of substance use testing (up to 72 drug tests per year), as directed and approved by the Probation Office;

(5) participate in a manualized behavioral program, as directed by the Probation Office. Such program may include group sessions led by a counselor or participation in a program administered by the Probation Office;

(6) contribute to the cost of all ordered treatment and testing based on his ability to pay, as determined by the Probation Office;

(7) not communicate, associate, and/or be in the presence of any individual or individuals known to be current or former members of the Latin Kings; and

(8) permit the Probation Officer(s), who may be accompanied by either local, state, or federal law enforcement authorities, upon reasonable suspicion of a violation of supervision by possessing firearms, to conduct a search Mr. Lars's residence, automobile, and any other property under his control or ownership

The Court recommends strongly that Mr. Lara consider participation in the H.O.P.E. Court program.

This ORDER will go into effect on May 31, 2023, to allow the BOP time to prepare Mr. Lara for reentry into society.

IT IS SO ORDERED.

John J. McConnell, Jr.
United States District Court Chief Judge

March 1, 2023

39